Good morning, Your Honors. Humberto Izaga and Luis Carrillo for the appellant, Richard Saviles. It is my honor to be representing Mr. Saviles, Deputy District Attorney, who is here present for these proceedings. Your Honors, this is a case in which Mr. Saviles, in attempting to perform his job as a district attorney, in the investigatory stages of his cusky case, he went out to the scene and did his own investigation concerning some issues that were raised by the defense attorney. The defense attorney pointed out to him that the sheriff deputies involved in the investigation of this matter had falsely made representations and were fabricating evidence. So Mr. Saviles, in order to do his job, went out there and discovered that, in fact, the deputies had misstated a very important fact, being that the description of a driveway was actually a street. And with that in mind, he reported that to his supervisors. As soon as that happened, a campaign of harassment started for Mr. Saviles. He prepared a memorandum describing the events, and he told his supervisors he should disclose that information to the defense under Brady v. Maryland, as he is required to do so. And this is a prosecutorial function that he's engaged in at this time, when he's doing what he's supposed to do. However, his supervisors, closing ranks with the sheriff's deputies from the County of Los Angeles, instructed him that he was not to do that. Counsel, let's get to the First Amendment case here. And obviously the question is whether there was qualified immunity. Did he ever make any of these statements outside the office? Did he call a press conference? Was he interviewed publicly? What was the extent of the speech that he is invoking here? Was it any of it outside the office, or was it all inside the office? I think the Court is looking to the issue of whether or not this was a matter of public concern. No, I'm just asking a simple question. Don't try to figure out what issue he's looking at. Just the facts. All right, just the facts. Well, he spoke to the Mexican-American Bar Association about this problem. He sought their assistance. But that was afterwards, wasn't it? That was afterwards. That wasn't what triggered any campaign, if there were one, of harassment. He testified in court about it. Well, in fact, let me clarify that. He attempted to testify in court, but his supervisor prevented him from doing that by objecting and objecting and preventing the truth from coming out during the motion. Well, no, no. What did he say? My understanding is, and maybe you can correct me, my understanding is that he brought this issue about these false, allegedly false warrants to his supervisor. Yes. And all of this discussion that went on was within the office. He wasn't being discredited or demoted, if that's what your allegation is, because of some statement he made to the bar or some statement he gave to the press, was he? Well, yes, Your Honor. If we put it all together in the total, all the events that occurred after this. No, no, no, no, no. Before he was disciplined, whatever you say, before there was retaliation. Judge Scanlon's question is, is it not correct that before the acts of retaliation, his statements were all made internally within the office rather than to the public or the bar or anyone else? If the Court considers the fact that an office where there are sheriff deputies who don't work for the district attorney's office are present, and he's being harangued and instructed by outside people that he's not. Okay. The way to answer the question, then, is not only you're saying he said these remarks were made before members of the district attorney's office in writing or otherwise and also before members of the sheriff's department? That is correct, Your Honor. Okay. Well, then that's a simple answer to the question. Thank you. You don't have to argue the consequences yet. Judge Scanlon's trying to get the facts straight. Yes, there was a captain, there was a lieutenant from the sheriff's department, and there were other employees. In fact, the actual individual sheriffs who were fabricating this testimony were present when they were telling Mr. Viles that he should not go forward with this information. Mr. Viles, at that point, felt that it was his obligation to continue disclosing this information. And from that moment forward is when the campaign of harassment and retaliation begins. First off, his supervisor, Najera, instructs him to modify his memorandum. Which he did. Which he did. And the defendants cite the case of Gonzales, the 7th Circuit case, that says that if the police officer was, as part of his functions, reporting misconduct, was retaliated against in that case, that it was not a matter of public concern because that was his job. And so this is, I think, intellectually dishonest to use that case, because if you look at it real carefully, and you'll see that the Court makes it very clear in that case, that if he had been asked not to report the misconduct and modified his versions within his job function, then it would be a matter of public concern because he would be acting as a citizen. Well, the 7th Circuit has this rule that if you're not speaking as a citizen but only as an employee, then it's not a matter of public concern. Is that the law in the circuit? It isn't the law in the circuit, but the judge did cite that in the lower court in this case. Well, isn't the law in our circuit quite the opposite? Excuse me, Your Honor? If it is not the law in our circuit, it's the opposite. I believe so. That's what the judge cited as a basis for finding that this was not a matter of public concern. Did you argue Roth to the district court? Yes, Your Honor. We argued that it was an incorrect statement of the law. And nonetheless, we're here arguing now that I don't think there's anything  Okay. So let's assume that we, whether or not we're going to look to the 7th Circuit, will clearly be bound by our own precedent. I just want to follow up on Judge O'Scanlan's question on the sequencing here. It went from a what let's say it was a routine action on the part of Mr. Ceballos as part of his job as a deputy district attorney to investigate as part of the prosecutorial function to go forward. And he reported it to his supervisor. She asked it to be put into a report. Now, at some point, there was a court hearing, correct, on the motion to suppress or was it? It was the motion to traverse the search warrant. Traverse, right. All right. Now, at that point, did he or did he not testify? He did testify to a limited extent. Okay. And did he testify about his concerns about the No, he was prevented from doing that. And that's a matter that I think the Court needs to recognize, that repeatedly in the appellee's briefs, they mentioned that it was found that Mr. Ceballos' accusations were totally false and that there was no basis for that. That's incorrect, because the trial court never made, was able to make that determination because Ms. Najera, Deputy District Attorney Najera, his supervisor, objected repeatedly when Mr. Ceballos attempted to bring that out during the motion. And it just never hurt any of Mr. Ceballos' evidentiary observations when he went out to the scene and found that these officers were, in fact, fabricating testimony. So in essence, what we had is his office was attempting to have Mr. Ceballos perpetrate a fraud on the Court and go forward with a prosecution of a case that should not have gone forward. And that's why I believe that there is a basis for municipal liability here on the issue is that the county basically had a policy of allowing sheriff deputies to fabricate warrants, use false testimony, and the ---- Let me ask you. Is the transcript of that hearing perverse or whatever? Is that in the record? Yes, it is, Your Honor. That is in the entire hearing. I believe it's O0081. But it is in the record. I don't have the exact pages. And you'll find, if you take a close look at it, that the judge was prevented from making the proper determination of Mr. Ceballos' observations. If Mr. Ceballos had been allowed to go forward and testify as to what he saw when he went out there at the scene, that it wasn't a driveway, but, in fact, it was a street that the deputies were attesting to, and the fact that the deputies had mentioned and were concerned with civil liability, if Mr. Ceballos was to bring that out, because they had been sued by the same Tuskegee defendant in another case, then the Court would have been able to make a proper determination. But the defendants continually make ---- refer to that hearing as though the Court had determined that Mr. Ceballos' accusations were, in fact, false, and the Court did not believe it. That is just a misstatement of the truth. Thank you, Your Honors. Good morning. May it please the Court. My name is Cindy Lee, and I'm representing the appellees in this action. I think with regard to the First Amendment issue, the speech here that we're talking about is this March 2, 2000 disposition memorandum. I think this issue, with the specific facts of this case, does present an issue of first impression for the circuit, and that is whether or not writings that were reported in this case or memorandum that may address public concern, but is also a routine report or document that's generated during the official duties, in this case of a prosecutor or any employee, if those give rise to First Amendment protection. Well, how do you get around Roth? I'm sorry, the Roth? How do you get around Roth? The Roth case was not cited below. I don't believe any parties have addressed it. It's sort of the critical case in this case, because it does, in fact, decide the issue of whether an internal investigative report can be a matter of public concern. When the guy was just doing his job, he was hired to be a troubleshooter, and the court, this court held that even though it was, he was speaking and writing as a simply reporting problems in the department that he was supposed to be investigating, satisfied the public concern test. So how are we, if this is first, maybe it's first impression for you, but I'm a little surprised you're not aware of it. The way that I categorize the case is, and that may fall into the category where it is part of the function, or that's the function at issue, and the officer is pursuant to his duties, is preparing the report. Well, isn't that what he's supposed to be doing? He's a prosecutor. He's supposed to go out and make a prosecutorial decision as to whether or not there is a constitutional violation. That's correct. So if that's his job, because I noticed in your brief, you're saying, well, he was just doing his job. But his job is, as an officer of the court, ethical obligations, obligations representing the public as well as just the county, that he is supposed to make informed judgments as to whether there is police misconduct. He would not appropriately, I assume, I don't think the district attorney or the county would be saying, if we know that there's a police misconduct and they lied on a search warrant, we should prosecute and suppress that information, correct? That's correct. All right. I think the critical difference here is if, and again, I don't have the benefit of, I do remember a lot of the cases in terms of the issues. But in this particular case, we have a disposition memo or report that was routinely prepared by the DA's office on any cases that the DA's office was handling. Part of the content of this report were information that was required to be disclosed if there was excavatory information. The other two factors, though, however, I agree, I concede that the content is one of the primary factors to be considered in determining whether or not a matter is of public concern for First Amendment purposes. But you also have to look at the form and the context. And in this particular case, this is an internal memorandum that was prepared pursuant to the prosecutorial's, prosecutor's function, and it was generated exclusively internally for discussion among the DA's office as to whether or not they were going to continue with the prosecution or whether or not they were going to dismiss, or in this case, allow a trial judge pursuant to a motion to traverse address the issue. The sequence of events that have occurred, I think, is very important because there was no the form that was chosen was all within the internal aspect. Well, how else if he, in other words, you're suggesting that we should encourage someone who has a belief in doing his professional duties to call a press conference rather than going to a supervisor and say, look, there's police misconduct here. And rather than go to the office, the supervisor, and say, I think we ought to dismiss this case or not prosecute it, in order to come to assert his First Amendment or have First Amendment rights, he should go public with it rather than pursue it internally. No, that's not what I'm saying. I don't think the circuit requires it. What I am contending, though, however, is this was not a generalized concern for this police misconduct in general. It was one specific case with regards to a deputy DA investigating whether or not the officer, the deputy who prepared the search warrant, was, in fact, grossly exaggerating or misrepresenting, I think there was a driveway or the residence, versus whether or not, I mean, it was his belief that there was false testimony by this deputy. So I think the distinction is we're not talking about a – the plaintiff's motivation wasn't to expose this general corruption within the sheriff's department. No. They're drawing the line, then, between exposing corruption by one official as opposing corruption by a whole host of officials. Not necessarily. And I suppose he had said, look, this is a problem we have, officers in this department who don't always tell the truth. Then he'd be okay? I think so. I think, again, it has to be fact-specific. And in this case, we're talking about a disposition memorandum that the prosecutor in this case, the plaintiff, prepared with regards to whether or not he believed that the search warrant was – had incorrect information, misleading information, or his personal view that it was perjured testimony. And the motion to traverse is, in fact, a part of the record. I wasn't able to locate it, but it was attached to our motion for summary judgment. And the testimony there talked about his investigation. It was – this internal memorandum that the DA's office uses is generally protected by work product, et cetera, because this is the DA's thoughts and processes about what or how the case should proceed. And routinely, they do get a scenario where they look at is there any excavatory evidence, did what the officer or police officers do in this particular case, is that going to cause us any Fourth Amendment problems? And so in this particular case, like all, just generally the majority of the disposition memos for the DA's office, they're dealing with a case-by-case scenario. So this clearly had no indication of the plaintiff soliciting or actually trying to shed to the general public that there's police corruption. It was a DA who went and investigated and came up, opined his own opinions about – But wait. Hold on a second. It's helpful to see how this process works. Okay. So he does the disposition memo. Correct. Okay. And then there is a conflict between him and the supervisors as to his assessment of the credibility of the police officer. Correct. Right? Okay. Now, but – and as I understand it from your standpoint, he's allowed to continue on the case. It's still his case. Right? Well, in this particular case, the case was assigned to a grade level two. The plaintiff, in fact, assigned it to another DA, but he took on the task of investigating. He wasn't removed from it, though. Correct. Until he was notified as a motion, as a witness for the defense, at which case – They called him. Okay. So now is that often done? Is that an unusual circumstance where the defense would call a prosecuting attorney as a witness? It's all case-by-case. I understand it's case-by-case, but I'm asking you, is this a very unique circumstance? You were talking about the method of operation of how these work. Correct. So I'm trying to understand. Was this a very unusual event to have an investigating attorney called by the defense as a witness? I think generally it would be. It's like an opposing counsel being called. But because he went and investigated, I think the – if you look at the motions the questions were basically just, what did you investigate? It wasn't ultimate conclusions because that's obviously not relevant for purposes of the case. And was he allowed to voice in any way his assessment of whether the credibility? I think the criminal defense attorney in that case attempted to elicit some of the specific comments that were made in the memo, but pursuant to objections by the DA's office, the judge made admissibility calls about whether or not, you know, a DA can actually even comment upon the credibility of an officer. Because, again, what this motion to traverse had to do with was whether or not, based upon the search warrant affidavit and the officer's testimonies about why they described things the way they did, if the trial judge believed that it was the officer's reasonable mistake in being off of the description of the path driveway versus the address I guess the discrepancy is, should he have labeled it a driveway or should he have said it was a street? I think so. Okay. Now, just – okay. That's helpful. Now, let me just ask you this question, then. Let's suppose that Mr. Ceballos believed and firmly believed that the officer was absolutely lying, that they had actually manufactured. And let's just take it and make it a little more hypothetical that it was a – there wasn't even a close call in his mind. It was a much more material aspect, not just a distinction between a driveway and a street, but that in fact they had dropped a gun there or they had, you know, all the things we hear that cops can do to manufacture evidence. He had that. But his supervisor said, no, you're not going to – our job is to prosecute the case. I don't buy your assessment of this. I'm going to give this cop the benefit of the doubt. Now, and it was just case-specific. All he's doing in this case is saying, look, I disagree and I think this would be an unconstitutional prosecution. Is it your position that because it's just the individual case, he has no First Amendment right to pursue that point of view, that he has to just swallow it and remain silent? Absolutely not. Then what would he do? What's his remedy? Well, the plaintiff in this case did, I think, what the DA's office thought was appropriate, which is you come to a situation where you think that there's a problem in the DA's case. In this case, it was exculpatory evidence. Bring it to the head deputy district attorney. But the head deputy, for whatever reason, good or bad, says, no, I don't buy it. So even though he firmly believes that the deputy, his supervisor, has made a mistake, so now he takes it to what level does he move before his First Amendment? I think what's very important in this particular case is that we're dealing with the DA's office. And just because you have a prosecutor who firmly believes that an officer is lying without evidence, so it's his personal opinion as a DA and as a prosecutor in the case, and he tells his supervisor, look, this is not a case that should be prosecuted or I cannot prosecute this case because I just don't believe an arresting officer, that scenario I guarantee will require his removal. All right. So he's pulled off. And then what? Is he now can he speak, even though it's just about a case? I don't think they're prohibited to speak on exculpatory evidence. In fact, I think they're required to disclose exculpatory evidence. He's disclosed it, but he's overruled. I understand this. I'm really trying to understand the process. The county bar just issued an indictment of the judicial system and the DA's and the city attorney's office for overlooking planted evidence out of the Rampart investigation. So it's a real problem. The question that's being posed here and that they're trying to present in their arguments, in their briefs, is this is whistleblowing on police misconduct in the sheriff's department, and he was squelched. And you're saying no. It's the First Amendment. He has no First Amendment rights because it's just a single case. He was not squelched. You say he wasn't squelched. It may be, ultimately, that he was not squelched. For purposes of the summary judgment motion, don't we have to assume that he was retaliated against because he engaged in the speech? Not necessarily, because the summary judgment motion had alternative grounds showing that there were nonbiased factors. But the district court didn't rule on those grounds, right? No. But this Court can. Unless we want to, let's just for the moment. Let's say we're examining just the district court's ruling. For that purpose, we assume that there was retaliation. If there's no retaliation, there's no violation of the First Amendment. Correct. And you're not arguing, I mean, the issue we're arguing here is based on the assumption that there was some retaliation. He was squelched because he expressed these views. I apologize. I think I misunderstood Judge Fisher's definition of squelch. In this particular case, he was not prohibited from speaking his mind. This was confined to the DA scenario because the DA's office wants to know, look, are we going to be able to win on this case? And this head deputy DA who Mr. Ceballos brought this incident to evaluated the memorandum, evaluated the deputies' comments about their inaccuracies, and believed that, you know what, the DA's office cannot be the judge, the jury. I'm assuming that he was disciplined for this, in effect. He was taken off his assignment. He was shipped out to Pomona. He was given the freeway transfer. You know, you can do it from down from San Pedro out to Lancaster. That's the sheriff's department used to do that. That was the way you taught bad sheriffs to be good. Freeway therapy, right? But, you know, we're assuming for this argument that he is disciplined for having complained about a bad cop. Now, you're saying that that's not a violation of the First Amendment. That's the only issue we're discussing here. Correct. Okay. And so the question is, if somebody blows the whistle to the supervisor about a cop who has committed perjury, can you discipline that person for engaging in that form of speech without violating the First Amendment? You have to look at the other. If it's strictly telling the supervisor in relation to a case that the DA is handling? I guess you're not familiar with Roth, the Roth case? Or are you or are you not? You know, I'm sure I am. I did a thorough check. I did a thorough check on this particular issue, specifically with regards to when there is certainly a public, I think, a public concern aspect to it. Obviously, not allowing for perjury testimony or police misconduct is certainly a public concern. But I think the more specific issue, which is what the iconic case in the Supreme Court is, is that this is a particular case. And here we're talking about a disposition memorandum that is the source of the speech that is routinely prepared by the DA's office. And I think the trouble that I'm having here is that this is a particular case. I understand your argument. What I'm trying to sort out was what was going through Judge Matz's mind when he was trying to resolve this. I don't think anyone brought Roth to his attention. It was not. Okay. Because he cited the Seventh Circuit case, which, if it isn't intention or conflict with Roth, is totally mooted by Roth as far as the circuit's concerned. My question is with respect to the connection between whatever the speech was and the bad things that started to happen to him. The requirement is that there has to be a substantial or motivating factor, that the speech has to be the substantial or motivating factor in the retaliation that is alleged. What can you tell us about the extent to which whatever it is he said, to whatever it is that he said, was the result of failing to get his raise, these other reassignments and so forth? Right. Well, we — and I don't believe it was — Help me figure out the connection between what he said and what happened to him. I think the difficulty that I had in this case was that from the defendant's perspective, from the head WDA and her — Mr. Ceballos's direct supervisor as well as the then D.A. Gil Garcetti, they didn't consider this speech at all. It had — it was of no consequence to them. They didn't consider it in these, you know, these employment decisions that occurred, and that's what the evidence has shown in support of a motion for summary judgment. Okay. But as Judge Reinhart points out, we're here on summary judgment, right? Correct.  So what is the opposite showing? What can we look to, to eliminate any fact issues on retaliation? Well, there was undisputed fact that with regards to the first alleged retaliation, which was his removal from the calendar deputy position in Pomona, Pomona D.A.'s office — I'm sorry, the Pomona Superior Court had undergone a consolidation where they didn't need four calendar deputies anymore. They only needed two. And so his position was eliminated. And that occurred in April. But does that still leave a question of fact with respect to substantial or motivating factor? With regards to the speech? I don't think so. I think the evidence wasn't refuted with regards to the basis, the legitimate basis for these employment decisions. So, I mean, the fact that the district court didn't get there, we did raise it and we cited them in — we made reference to it in our appeal, and Ninth Circuit courts can affirm on any grounds, even those — even the grounds that weren't addressed by the district court that the record is complete. And that was the final argument that we threw with regards to the legitimacy and the non-causal connection between this speech. But I think more importantly, the troubling aspect of, I think, of this case, because it's so unique in the D.A. situation, is then where do you draw the line? If you are going to allow in a D.A. context these disposition memos, anything that D.A.s prepare in these reports, and subsequently they get transferred, or they don't get the promotion, or they, you know, they get a write-up of something else, well, then any D.A., deputy D.A., can point to any number of disposition reports where they commented upon the evidence. I mean, we're talking about a situation — Kennedy. That's not so. I mean, if Mr. Ceballos were ultimately to win this case, it would have to be because he could prove that the reason he was transferred or the reason he was treated in this manner was because he had reported illegal conduct in the department. He can't win just because he says, I got a transfer after I wrote a memo. Now, what would be wrong with a trial? Let's assume a deputy D.A. wrote and said, the cops on this case are rotten. They're perjurers. And then the D.A. decided, we don't want bad relations with the cops, so I'm going to send them out to Lancaster. Do you think that would be a bad result for the D.A.'s office, to have the decision that you can't do that because a deputy D.A. reported corruption in the department? I think the unique facts of this case are, because we have the D.A.'s office and the prosecutors, obviously anything in these disposition memos, these are what they routinely prepare on all cases. And so if you allow this broad rule that any — I mean, generally, what D.A.s are going to put in these disposition memorandums are going to primarily be of public matter concerns because they're dealing with whether or not a case should go forward or exculpatory evidence. These are their thought processes in terms of how the case is coming along, and it's usually given to the head deputy D.A. for signature. The head deputy D.A. either approves it or rejects it. And so the concern here is that when you have a document that is routinely prepared by a particular employee, and that just because they routinely prepare this document, that now all of a sudden that is, per se, First Amendment speech. How often do those routine documents, do they routinely accuse cops of illegal conduct? Well, I can't comment on that. Well, your concern is, as I understand it, is because whatever is in them is a matter of public concern. Your concern is that then any time an adverse employment decision is taken at any time proximate to issuance of one of those disposition memos, that they automatically — it automatically converts it into First Amendment. Correct. That's the concern, and then we get into Pickering balancing. Absolutely. I know that you've had trouble with the balancing aspect because your position wasn't — you weren't disciplining them for the matter. And that's the exact problem here, because then when you have deputy — when you have supervisors in a DA setting, and they're not paying much attention to the specific speech because it's part of a routine job. They go to the head deputy DA, hey, this is my case. Here are the problems I have. These are the good points. I don't know if I can win this. I actually don't like this — this officer that was on this case because, you know, he happens to be a neighbor of mine. Or for whatever reason, this is all included in the disposition memorandum. And the head deputy DA decides, well, let's let the courts decide. I don't think it warrants absolute dismissal. I think there could be some rationale why that, you know, they're — they're — that this — I think they're being too harsh. I don't think this deputy or officer deliberately lied. Let's leave it up to the court. Or any dispute that an employer, a supervising DA, may have with a subordinate DA about how the case is proceeding. So any time you have a head deputy DA who will not sign off on a disposition memorandum that agrees with your thought process on this case, and you have an adverse employment action, well, now we're here — now they get automatic First Amendment protection because it's a matter of public concern. And yet — You know, you can make that argument. You can make the same argument about Title VII. You know, any time a black or a woman gets fired, they can claim the reason I'm fired is because I'm black or I'm a woman, and therefore we shouldn't have protection for blacks and women. Well, here the problem is, then we can't — The problem is that you have to show, to win a case — I understand that, but then — The reason — the reason you're disciplined is because you're a black or a woman. Or you have to show the reason you're disciplined is because you said this in the memo. I think the difference, though, is — But any of these laws can be abused by people who just say the reason is that I'm disciplined is because I told the truth. I understand. But I think the difference here is that with regards to the pickering factoring, then the employer doesn't get the benefit of using the balancing because, you know, their contention is, you know, we didn't pay attention to the specifics of what he had to say with regards to one out of a hundred disposition memos that they prepared because, you know, that's just a part and parcel of what DAs do. And yet, when you have situations where there may be actually adverse employment action based upon a admitted First Amendment speech, the employer gets the benefit of at least, you know, doing the balance well, should we have authorized a transfer or demotion because his politics were in line with what the supervisor had. But, I mean, in this particular case, because — these are routine disposition memos. And I gather with Roth, I could be speculating, but those investigative reports didn't necessarily have to, you know, include ultimate, I think — I don't think they implicated what the — in that particular case, the investigator, what their function was, which is do the investigation, make their little, you know, the conclusions and summaries about their investigations. Here we have a DA situation where inherently these are all part and parcel of what the DA's office considers and how they prosecute the actions. And so because these are so routine and they implicate — and when you do the proper analysis between the content form and the context, these DAs are not — and in this particular case, Mr. Ceballos was not commenting on his investigation to shed light, I think, on this — this particular problem of, you know, abusive police misconduct or perjury among police officers. But it was his comments upon this particular case. And he admitted in his deposition, he considered, can we keep this case based upon other, you know, bases? In other words, is this case going to survive even if we lose a motion to traverse? And he concluded that it — you know, he couldn't. But I think because these disposition memorandums are so unique with regards to the DA's office and because they're so routine, to give them this carte blanche any time you have a — any kind of speech or comment or criticism during the workplace with regards to what your duties are, especially in this context of a routinely prepared official document, that automatically they get First Amendment public concern requirement there and then go to the other balancing. You know, you could have a rule, for instance, as one of our extremely able judges wrote in Kaiser, that where you have — that we have a series of cases establishing that the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs the state employer's interest in that. In that case, it happened to be avoiding a mere potential disturbance to the workplace. But all we would have to say in this case is that that interest of ours in learning about illegal conduct is such that we would look at — that that would outweigh whatever employer interest there may be in, you know, in treating these memoranda differently than you would any other form of report. I think the only case we have to deal with now is not whether all memoranda present First Amendment issues, but whether a memorandum accusing an officer of improper or illegal conduct is First Amendment protected. Well, and again, what we have to remember in this particular case is this was not Mr. Ceballos's case. He had assigned it to another individual, and he was investigating to see if there might be problems with the search warrant pursuant to a request. But, I mean, ultimately, I think the — as I mentioned, the problem here would be with regards to trying to frame some bright-line rule, because we did cite to the Sixth Circuit, the Seventh Circuit, the Eighth Circuit has addressed this. The only one they didn't cite to was the Ninth, unfortunately. Well, I don't — and like I said, I apologize if that was directly on point. But all the cases that I had looked at by the Ninth Circuit didn't specifically address this issue with regards to a routine in the context, the form, and the context where in a DA situation where this is part and partial of a work product that normally doesn't even get, you know, disclosed. But — and that's why with regards to the — Kennedy, I think we've already given you 50 percent more time than you were allowed, because your argument was very able and interesting. I think, again, we would urge that with regards to this qualified immunity issue that there is an ample record to fall on the other aspects of qualified immunity and the legitimate interest in the failure of a causal connection with the retaliation. Thank you. Thank you. Your Honors, I'd like to split — how much time do I have? I'd like to split some of it with the Co-Counsel, Mr. Carrillo. If that would be okay with the Court. Yes, you have time left, if you'd rather have it. Okay. Just very quickly, I just wanted to address some of the matters that Ms. Lee addressed when she was talking about this thin line. I think it's real important to note that we can't just narrow it down to this memorandum. This case is not just about this memorandum. This case is about a situation where he wrote this memorandum and then he was doing things to bring out this police misconduct. And sheriff deputies and lieutenants, captains from the sheriff's department were telling the district attorney's office how to prosecute cases. They told Mr. Viles, don't do it this way or you're going to be in trouble with his office. His supervisor told him that. And then all the events that began to occur after he began — after this memorandum took place, after March 2nd, in the year 2000, which I believe was when the Rampart scandal first broke out and there was this heightened concern with police misconduct, Mr. Ceballos wanted to come forward with this and — What do we do with the fact that the Court found there was no police misconduct in this situation? In other words, the statement that Mr. Ceballos made turned out to be not true. That is the mischaracterization that the appellees have presented to this Court. That was never determined by the Court. That is just not true. The Court never made that determination that what Mr. Ceballos saw and observed and investigated was not true. They — Well, what did it decide? What did the Court decide? The Court decided that the search warrant was proper and that — Including all of the allegations or statements in it, right? Right. But that's because it didn't get to the facts that Mr. Ceballos was raising, the misstatements of the truth that he went out and personally observed, because the supervisor was not going to let that happen, because she was following the instructions of the sheriff's department that told her to not let this come out. They specifically instructed him not to do that, and we have evidence to that effect presented with the record. In fact, the lieutenant specifically — and this is one thing Counsel forgot to mention — the lieutenant specifically requested that Mr. Ceballos be recused from further handling of the case at this meeting. And what did the district attorney's office do? That was the first form of retaliation. They did comply with the sheriff's department. So this is not limited just to a simple little motion in her memorandum and how people handle those memorandums, and the district attorney's office just deciding that it's appropriate or not appropriate for him to write that memorandum within the confines of their office. This was another county governmental office, the sheriff's department. They came in and was telling them how to do things. That's why I believe that there's a good case here for municipal liability and that they were allowing the prosecution of cases that were being based on fabricated testimony and innocent people were being prosecuted. And Mr. Ceballos wanted to bring that out with this case. He was prevented from doing so, and because he attempted to do so, we had the retaliations that were set forth in the case. I believe Mr. Carrillo can address the remaining parts. Good morning. I just want to be very brief on an issue. Would you give your name, please? Yes, sir. My name is Luis Carrillo. I'm one of the attorneys for the appellant, Mr. Ceballos, who's sitting behind us. I just want to point out what she has referred to on numerous occasions, my honorable opponent. She has referred to the memorandum as a routine memorandum, in-house memorandum. However, when you view the case in its proper context, we have here a memorandum that is unusual in one respect. It directly and indirectly accuses police officers of fabricating probable cause, fabricating evidence. That makes this not a typical routine memorandum. And also ---- One thing I wasn't clear about. Your opposing counsel said that this really was not his case. And how was this, how did it come about that he wrote the memorandum if this was not his case? Well, if it was not his case, then as a supervisor, he would have oversaw the other deputy district attorney investigating the case. And as a senior deputy district attorney, he could have investigated the case for the junior deputy district attorney. And I'm not clear as to whether or not he was initially assigned the case or not, or whether he just assumed responsibility for the case himself. Because what I wanted to focus on at this point was that this was not a routine memorandum, and also the total context of what happened in Pomona. What happened in the Pomona Superior Courthouse was that not only did Mr. Ceballos discuss the memorandum with his superiors, he also discussed it with fellow deputy DAs like Mr. Grossbart. He spoke to the defense attorney involved in the Kuski case, the defense attorney representing Kuski. He spoke at the motion to traverse. And then it became in the nature of a public forum. When he was speaking on the motion to traverse ---- No, we do not believe that he was able to fully tell the court that he, in his opinion, the police deputy, the sheriff's fabricated probable cause and misstated in the affidavit that the so-called driver was really a street. We do not believe that he was permitted to do that because of the constant objections by his superior deputy DA Najera. But when we are in a courthouse, in a motion to traverse, in a public courthouse, now we have a public forum. Because if he was given the leeway ---- I don't see how you can have it both ways. He either had it, made these statements in a public forum, in which case the court ruled after hearing the statements, or he didn't make them in a public forum, in which case you can't say he made them in a public forum. He made them, I would submit he made them half, and the other half he was not permitted to fully explain because of the objections by the deputy DA. So he started to advise the court, and the defense attorney argued to the court where the misstatements were contained in it. The court did not agree with the defense attorney, but leaving that point aside, the focus now is not on an internal, in-house deputy district attorney to a superior in Pomona. Now it is beyond that, Your Honor, when he's speaking to many other people about the memorandum, including the judge, including whoever was ever in the courthouse present, was present in the courthouse. Now we have the aspect of public discussion over an issue that is very important. As you've just indicated, Your Honor, the Rampart scandal that unfolded in September of 1999. This is March 2000. We have daily reports. The court can take additional notice in the L.A. Times regarding the Rampart scandals. A matter of police perjury was a monumental or should have been monumental concerns to Garcetti at the time, to anybody in Pomona's superior court. Now, wait a minute. When you're arguing that this became a public matter when it came up in court, did Mr. Ceballos bring this matter up in court? What unfolded was that he had discussions with the defense attorney representing Kesky. The defense attorney made a motion to traverse the search warrant and specifically attack the affidavit in the search warrant. He was called as a witness. He testified in court. He was cross-examined. And at one particular page, Najera even asked him about his memorandum. So now part of it comes in insofar as to what he was trying to say to his superiors. But not all of it came in. Not his opinion that he was he believed that the deputy sheriff's fabricated probable cause. And so. Well, when I asked your co-counsel, Mr. Guzar, that did all of it, was there any statement made beyond outside the office? I thought he told me no. I can't answer for him, but I'm just looking at the record that you have before you. And in the record that you have before you, clearly in the transcript of the hearing itself. And if you permit me, I can go to it. That's fine. But your argument is that whatever he said in that courtroom is what triggered the retaliation. That's the basis of your claim. Well, everything that he did in this case triggered the retaliation from reassignment of murder cases, taking off of murder cases, freeway therapy. But it was part and parcel of what he was doing. What I wanted to focus on is that this is not, as my honorable opponent says, a routine internal memorandum which has no First Amendment protection. It goes beyond that. It goes beyond that in his discussions with fellow deputy district attorneys, defense attorneys in the Kutsky case, to a judge in a public hearing, in a motion to traverse. Now we have other elements where free speech is involved and the First Amendment is involved, and that's where his superiors, they do not engage. This is not about just a Kutsky prosecution. You've mentioned twice now the discussion with his fellow deputy district attorneys. When did that happen in the sequence? It happened in the same month of March. Sequentially. He sends the memo. He has the meeting with his supervisor. They have the meeting with the L.A. Sheriff's Office there, correct? I think that the meeting with the discussion with Grossbart occurred subsequent to the March 2nd memorandum. Okay. Grossbart is? The fellow deputy district attorney. Okay. Grossbart. That he discussed the case with. So that there this is not just about a criminal prosecution. What it is, is about retaliatory action taken against an employee who does engage in First Amendment protected speech. Thank you. Thank you very much. The case just argued will be submitted.
judges: Reinhardt, O'scannlain, Fisher